# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 2, 2015 Session

## STATE OF TENNESSEE v. MICKEY EDWARDS

### Appeal from the Criminal Court for Shelby County
#### No. 12-05547    Chris Craft, Judge

_____

### No. W2014-00987-CCA-R3-CD  -  Filed August 27, 2015
_____

Mickey Edwards ("the Defendant") was convicted of four counts of aggravated burglary, four counts of theft of property, one count of identity theft, and one count of fraudulent use of a credit card.  On appeal, the Defendant challenges the denial of a motion to suppress evidence seized during his arrest, the denial of his motion to sever the counts in the indictment, the denial of his motion to exclude evidence of his prior convictions, and the sufficiency of the evidence supporting his convictions.  Upon review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR. J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Stephen C. Bush, District Public Defender; Barry W. Kuhn, Assistant District Public Defender (on appeal); William Yonkowski and Katherine Oberembt, Assistant District Public Defenders (at trial), Memphis, Tennessee, for the appellant, Mickey Edwards.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Marianne Bell, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

The Defendant was indicted for the following charges:

| Count | Charge | Victim | Offense Date |
|---|---|---|---|
| 1 | Aggravated Burglary | Jasbir Dhaliwal | June 2011 |
| 2 | Theft of Property valued at over $1,000 | Jasbir Dhaliwal | June 2011 |
| 3 | Identity Theft | Jasbir Dhaliwal | June 2011 |
| 4 | Fraudulent Use of a Credit Card over $1,000 | Jasbir Dhaliwal | June 2011 |
| 5 | Aggravated Burglary | Bradley Mundt, Kelly Mundt, and Gisela Mundt | November 2011 |
| 6 | Theft of Property valued at over $1,000 | Bradley Mundt, Kelly Mundt, and Gisela Mundt | November 2011 |
| 7 | Aggravated Burglary | Lori Williams | November 2011 |
| 8 | Theft of Property valued at $500 or less | Lori Williams | November 2011 |
| 9 | Aggravated Burglary | Dena Barker | November 2011 |
| 10 | Theft of Property valued at over $1,000 | Dena Barker | November 2011 |

*Motion to Suppress*

Prior to trial, the Defendant filed a motion to suppress items which were seized during a search of his car, including two notebook pages containing a list of addresses in Germantown, pawn shop business cards, a Cricket cell phone, and a bag of coins totaling $83.40, along with some foreign coins. Germantown Police Department ("GPD") Officer Nicolangelo Iacobucci testified that he responded to a report of an aggravated burglary at the Mundt residence on Spring Hollow Lane on November 26, 2011. When he arrived at the scene, the victim informed him that various electronics and pieces of jewelry had been taken from the home. Officer Iacobucci also observed that the home's telephone wires had been cut, the electric meter was pulled from its casing, and the rear door to the house had been forced open.

Officer Iacobucci reported that there had been several burglaries in the area around Spring Hollow Lane. Every day during roll call for at least two weeks prior to the burglary at the Mundt residence, officers were given a photo of the Defendant as a possible suspect because he was a known burglar and the method of operation ("MO") used in the burglaries was consistent with the Defendant's MO. As part of this MO, the Defendant would "case" houses and look for signs that the occupants were out of town—such as mail in the mailbox or newspapers in the driveway. After determining the occupants were not at home, he would cut the phone lines, move the electrical meter, and force open the back door of the house in order to steal electronics and jewelry. Additionally, officers were told to be on the lookout for a silver Mercedes with a specific tag number. Based on Officer Iacobucci's observations at the Mundt residence and the information from the victim, he concluded that the burglary was consistent with the Defendant's MO.

While Officer Iacobucci was speaking to another officer in the victim's driveway, he saw a silver Mercedes drive by the house, traveling slower than the posted speed limit. Officer Iacobucci also observed a black male driving the car. As the car passed the driveway, Officer Iacobucci saw the driver look at the officers in the driveway with a disbelieving, "deer in the headlights look." Officer Iacobucci recognized the tag number on the vehicle as the same tag number he had been given during roll call. Consequently, Officer Iacobucci followed the Mercedes in his patrol car and ran the vehicle's registration through the police dispatch. Dispatch informed him that the vehicle was registered to the Defendant.

Officer Iacobucci subsequently stopped the vehicle and asked the Defendant to step out of the car. As the Defendant exited the car, "folded up pieces of paper" fell from his lap onto the ground, and the Defendant attempted to kick the pieces of paper under the vehicle. Officer Iacobucci retrieved the pieces of paper and saw that the papers contained a list of addresses of homes in Germantown and descriptions of the homes, such as whether there were cars in the driveway, mail at the door, or newspapers piling up at the homes. Officer Iacobucci notified his supervisor, who had officers check the addresses to see whether any had been burglarized. Two of the homes on the list had been burglarized—one on Deerfield and one on Gotten Way. At that point, Officer Iacobucci arrested the Defendant. The Defendant's vehicle was inventoried pursuant to routine police procedures before it was towed. During the inventory search, officers found various items including pawn shop cards, a Cricket cell phone, and a bag of coins totaling $83.40. The bag also contained some foreign currency.

On cross-examination, Officer Iacobucci admitted that no fingerprints were found at the Spring Hollow Lane house. He estimated that he investigated approximately sixty burglaries each year, and he admitted that it was not unusual for the residents to be out of

town when a home is burglarized or for the back door to be forced open to gain entry to the house. He also stated that it was not unusual for electronics and jewelry to be stolen during a burglary. However, Officer Iacobucci had only investigated one or two burglaries where the phone lines were cut and the electrical meter was removed.

Officer Iacobucci explained that the Defendant was identified as a suspect because he was a known burglar who had been arrested in Germantown on previous occasions. Officer Iacobucci explained that he followed the Defendant's vehicle based on the surprised look on the Defendant's face as he drove by and the fact that Officer Iacobucci recognized the vehicle's tag number as the same one given to him during roll call. After Officer Iacobucci stopped the Defendant's car, he asked the Defendant to step out of vehicle so that he could check the Defendant for weapons. On redirect-examination, Officer Iacobucci stated that he had not previously investigated a burglary with all five factors that were involved in the Spring Hollow Lane burglary—occupants out of town, phone lines cut, power meter removed from the house, forced entry through the backdoor, and electronics and jewelry stolen.

The trial court denied the Defendant's motion to suppress. Specifically, the trial court found that, based upon the MO used in the Spring Hollow Lane burglary, the information given to Officer Iacobucci during roll call, and the "deer in the headlights look" he saw on the driver's face, Officer Iacobucci had "articulable and reasonable suspicion that the driver had committed a crime or was about to commit a crime, [and] a particularized and objective basis for suspecting the driver of criminal activity." Therefore, Officer Iacobucci had the right to make an investigative stop.

The trial court found that Officer Iacobucci properly ordered the Defendant out of the vehicle for officer safety, at which point, the papers fell from the Defendant's lap and the Defendant tried to kick them under the car. Regarding the papers, the trial court held, "Once [Officer Iacobucci] observed the [D]efendant kick papers under the car, he had a right to investigate the papers, which were not seized as the product of an arrest, but had been abandoned by the [D]efendant, who no longer had an expectation of privacy in the papers." Officer Iacobucci did not place the Defendant under arrest until he had confirmed that some of the addresses listed on the notebook paper had been burglarized. The trial court concluded that, once the Defendant was placed under arrest, Officer Iacobucci had a right to conduct a routine inventory of the Defendant's vehicle before the vehicle was towed.

- 4 -

*Motion to Sever*

The Defendant also filed a pre-trial motion to sever the offenses listed in his indictment pursuant to Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure.[1]  At a pre-trial hearing,[2] the State argued that the offenses should not be severed because the list of addresses found during the investigation of one of the burglaries led to the discovery of the other burglaries.  Consequently, the State averred that the offenses were inextricably linked because proof of one would be admissible to prove the other.  Additionally, the State contended that the unique MO used in each burglary linked them together.  As to the burglary of Mr. Dhaliwal's residence, the State admitted that its connection to the other offenses was more tenuous because it was committed months before the other offenses and the exact address was not included on the list of addresses.  However, the State argued that the charges stemming from that burglary should not be severed because houses near Mr. Dhaliwal's residence were included on the list of addresses found with the Defendant and because the same MO was used on Mr. Dhaliwal's house as the other burglaries.  The Defendant argued that the crimes were not part of a common scheme or plan—it was "simply a string of burglaries."  In response, the State argued that the list of addresses indicated that the Defendant had a larger scheme or plan to burglarize homes in the neighborhood when the residents were out of town and that this plan lasted from June until November of 2011.

The trial court found that the offenses were part of a common scheme or plan based on the fact that the Defendant had a list of addresses with notes indicating whether the occupants were out of town.  Additionally, the trial court found that the Defendant had a clear goal to commit burglaries.  Further, the trial court found that, had the offenses been tried separately, the State would have been able to introduce evidence of the other burglaries under Tennessee Rule of Evidence 404(b) in order to show why he had a list of addresses in his possession.

*Rule 609 Hearing*

The State filed a Notice of Intent to Use Certain Convictions for Impeachment, which included the following prior convictions: five convictions for aggravated burglary; two convictions for robbery with a deadly weapon; and one conviction each for alteration of a U.S. Postal money order, attempted aggravated burglary, theft of property over

---

[1] The record is not clear whether the offenses were mandatorily joined pursuant to Rule 8(a) of the Tennessee Rules of Criminal Procedure or permissively joined pursuant to Rule 8(b).  However, the parties explicitly assumed at the severance hearing that the offenses were joined under the "same or similar character" standard of Rule 8(b).

[2] No evidence was presented at the severance hearing.  Instead, the trial court explicitly stated that it was relying on evidence that had been presented at the prior suppression hearing.

$1,000, identity theft, fraudulent use of a credit card over $1,000, concealing stolen property over $200, assault to commit rape while employing a firearm, and burglary with a firearm. After hearing arguments, the trial court ordered that the State could not ask the Defendant about any of his prior aggravated burglaries or attempted burglaries because those convictions were too similar to the charged offenses. However, the trial court allowed the State to use the Defendant's prior convictions for alteration of a U.S. Postal money order, identify theft, theft of property, and fraudulent use of a credit card because those convictions reflected on the Defendant's credibility and their probative value outweighed their prejudicial effect.

*Trial*

GPD Officer Thomas Black testified that he responded to a call for a residential burglary at a home on Pine Valley Lane ("the Dhaliwal residence") on June 9, 2011. When he arrived, he found that the gate to the backyard was open, the power meter had been partially pulled off its connection, and the back door to the house was pried open. Inside, he noticed the TV was missing from the living room. During his investigation, Officer Black spoke to the home's owner, Jasbir Dhaliwal, on the phone. Mr. Dhaliwal informed Officer Black that a TV was supposed to be in the living room. Officer Black called the crime scene unit, who dusted the scene for fingerprints and took photographs.

On cross-examination, Officer Black could not recall whether anyone had canvassed the neighborhood for witnesses to anything unusual at the Dhaliwal residence. Additionally, Officer Black did not know whether the crime scene unit had recovered any usable fingerprints from the scene. Officer Black did not recover any forensic or physical evidence from the Dhaliwal residence which could be used to identify a suspect.

Jasbir Dhaliwal testified that he lived in the residence on Pine Valley Lane with his wife and three sons. He was a professor at the University of Memphis. On May 31, 2011, Mr. Dhaliwal and his family left to visit his family in Singapore. They planned to return on June 21, 2011. Mr. Dhaliwal asked a friend and colleague, Colin Onita, to drive by every three to four days to check on the house, but he did not give Mr. Onita a key to the house. Mr. Dhaliwal reported that he did not have a security system and he left his home with everything "closed and locked." He had cancelled the newspaper delivery but later found out that the newspapers had still been delivered.

In early June 2011, Mr. Dhaliwal received a phone call from Mr. Onita, who then passed the phone to police officers. Mr. Dhaliwal informed the officers that he could not return to the country easily. He eventually returned to the United States on June 21, 2011. Mr. Dhaliwal reported that his credit card had stopped working while he was abroad.

When Mr. Dhaliwal returned to his home, he saw that the back door had been pried open and would not close. Also, there was no power to the house. Inside the house, drawers had been opened and items scattered across the floor. Two TVs, various video game machines, and a laptop were missing. Additionally, all of Mrs. Dhaliwal's jewelry and a credit card belonging Mr. Dhaliwal's youngest son were missing. Although the credit card bore the son's name, it was attached to a family account, and Mr. Dhaliwal paid the bill for the account. Mr. Dhaliwal recalled that he had told his son not to bring the credit card on the trip to Singapore and that he watched his son place the credit card on a shelf in his room.

Mr. Dhaliwal reviewed the charges made on the missing credit card. He found several charges from Memphis convenience stores made during the time Mr. Dhaliwal and his family were out of the country. There was also a charge to Health Solutions Network that was not made by any member of the Dhaliwal family.

Mr. Dhaliwal stated that he did not know the Defendant and that he did not give the Defendant permission to enter his home or take any of his property. Additionally, Mr. Dhaliwal denied signing for a FedEx package delivered to an address on Boxdale Street in June of 2011. He also denied giving anyone permission to sign his name for that package.

On cross-examination, Mr. Dhaliwal stated that he was not at home when the burglary occurred and he had never seen the Defendant. He did not believe anything bearing his personal identification had been stolen during the burglary. On redirect examination, Mr. Dhaliwal stated that it was possible that something was taken from his house that had his name on it.

Aaron Rumley testified that he had lived at a residence on Boxdale Street since 2006. On June 10, 2011, FedEx delivered two packages to Mr. Rumley's residence. One package was addressed to Mr. Rumley's brother. However, the other package was given to a man on a motor scooter who had pulled into Mr. Rumley's driveway. Mr. Rumley signed for his brother's package, and the man signed for the other package. The man told Mr. Rumley that the package contained some kind of medicine. Mr. Rumley testified that he had never received packages of medicine at his home for unknown persons before this incident. Also, he had never seen the man on the scooter before the day the packages were delivered. Mr. Rumley saw the name on the package started with a "D" but the rest of the name "looked like a bunch of letters just . . . put together." Mr. Rumley did not recognize the name. The man in the driveway said the package was addressed to him and produced a form of identification to accept the package. Mr. Rumley described the man as a "tall, slender guy," about five feet nine inches tall, in his late forties with a dark complexion, a "low haircut," and some facial hair. The man was standing about five feet away from Mr. Rumley. After the packages were delivered, the man on the scooter left.

A few weeks after the packages were delivered, the GPD contacted Mr. Rumley. Mr. Rumley accompanied officers to the police station to give a statement and to view a photo lineup. He was able to identify the man on the scooter in the photo lineup, and that photo lineup was published to the jury, along with Mr. Rumley's marking identifying the man he saw in his driveway. Since viewing the photo lineup, Mr. Rumley's eyesight had deteriorated, and he could no longer make out facial features. Therefore, he was unable to determine whether the man who was in his driveway was present in the courtroom at trial. However, he affirmed that, in 2011, his vision was 20/20 when he was wearing his glasses. He reported that he was wearing his glasses when the packages were delivered to his home in June of 2011 and when he made the identification from the photo lineup.

On cross-examination, Mr. Rumley admitted that he did not see the ID the man showed to the FedEx carrier. He also recalled that the FedEx carrier commented that the name on the ID matched the name on the package. He did not see a credit card in the man's possession. Mr. Rumley claimed the man "acted weird" and said he thought the man may have been on drugs. Additionally, Mr. Rumley confirmed that he did not view the photo lineup until two and a half months after the man on the scooter retrieved the package from Mr. Rumley's residence. Mr. Rumley admitted that he was arrested previously for missing a prior court date in this case, for which he was under subpoena. He was released after he provided his testimony. Mr. Rumley also agreed that he told police he was 100% certain about his identification in the photo lineup, and he agreed that he said the same thing on direct examination. However, after watching an excerpt from the video of himself viewing the photo lineup, Mr. Rumley admitted that he told police that the photo he identified was "probably" the man he saw in the driveway. However, Mr. Rumley maintained that the officers later asked him how certain he was about his identification and he said he was 100% certain.

On redirect examination, Mr. Rumley confirmed that he had consistently told people he was 100% certain about his identification. He also stated that, after he was arrested for missing a court date, the State did not tell him he would get out of jail if he testified a certain way at the preliminary hearing. In fact, he was not certain that he would be released from jail after he provided his testimony.

Faustina Vaskquez testified that she cleaned houses for some families in Germantown. On November 26, 2011, Ms. Vaskquez went to clean Dena Barker's house ("the Barker residence"). She knew Mrs. Barker would not be home and expected to find a key near the back door. When she arrived, Ms. Vaskquez saw that the exterior glass door was closed, but the actual back door to the house was partially opened. Ms. Vaskquez thought that someone was home and had left the door open for her. When she walked through the kitchen, she noticed that the envelope containing her pay, which should have been on the kitchen counter, was missing. When she entered Mrs. Barker's

bedroom, she saw that there was "a whole mess of things" tossed on the bed, including jewelry. Ms. Vaskquez had never seen Mrs. Barker's jewelry strewn that way. At that point, Ms. Vaskquez called her sister and asked her to call Mrs. Barker to determine if Mrs. Barker had left her jewelry strewn across the bed.[3] After making that call, Ms. Vaskquez's sister called and stated that Mrs. Barker thought someone had must have broken into the house. Mrs. Barker then called one of the neighbors and asked them to go over to check on the house. After the neighbor arrived, Mr. Vaskquez went to work cleaning the house.

On cross-examination, Ms. Vaskquez could not recall whether the back door had been forced open. However, she stated that the lock had not been broken. She also recalled the power was on, but she did not know whether the phone line was working. She stated that she had never seen anyone else use the Barkers' spare key.

Mrs. Barker testified that she lived on Gotten Way with her husband, son, and two daughters. During Thanksgiving week of 2011, she and her family traveled to Arkansas to visit Mrs. Barker's parents for the holiday. Mrs. Barker, her husband, and her youngest daughter left the Barker residence on the Tuesday before Thanksgiving. Her son and eldest daughter left the residence the following morning. Before she left, Mrs. Barker left a note for her older children instructing them to leave the back door unlocked so that Ms. Vaskquez could come in Wednesday morning and clean. Mrs. Barker also left an envelope with cash next to the note as Ms. Vaskquez's payment.

Mrs. Barker stated that she did not stop the mail or newspaper delivery while she was out of town. Instead, she asked a neighbor to come by and "throw the [news]paper up by the door" near the garage. The garage was visible from the street.

Mrs. Barker recalled that she received a phone call from a person she thought was Ms. Vaskquez's mother asking if Mrs. Barker had left a mess in her bedroom. Mrs. Barker stated that she did not. She also spoke to a policeman who told her there was no need to come home immediately. Mrs. Barker came home the next morning as originally scheduled. When Mrs. Barker arrived home, the back door was shut and locked. Mrs. Barker reported that jewelry, money from her son's piggy bank, and Ms. Vaskquez's payment were gone. Mrs. Barker explained that there was one "very, very nice" piece of jewelry missing—a large ring that her aunt had given her as an heirloom that had green and black diamonds that was worth about $4,000. Mrs. Barker stated that she did not know the Defendant and that she had not given him permission to enter her home or take her property.

---

[3] Ms. Vaskquez explained that she asked her sister to call Mrs. Barker because her sister spoke more English than Ms. Vaskquez.

On cross-examination, Mrs. Barker stated that the power was on and the phone lines were working when she returned home. On redirect examination, she said the spare key was missing.

GPD Officer Christian Jefferson testified that he responded to the Barker residence on November 26, 2011. When he arrived, Ms. Vaskquez was there, and she advised him that she had found jewelry boxes and jewelry strewn all over the bed in the master bedroom. Officer Jefferson called the crime scene unit, who dusted for fingerprints and took photographs. On cross-examination, Officer Jefferson stated that no fingerprints were collected from the Barker residence. Also, he did not recover any evidence from the home that could have been used to develop a suspect, and he did not canvass the neighborhood to determine whether anyone had seen anything unusual.

Kelly Mundt testified that she lived on South Spring Hollow Lane ("the Mundt residence") with her husband, Bradley Mundt, their two children, and her mother-in-law, Gisela Mundt. On the week of Thanksgiving in 2011, the entire family traveled to Nebraska to spend Thanksgiving with Mrs. Mundt's father-in-law. Mrs. Mundt stated that she had a security system installed in her house and that the doors and windows were locked when they left town. However, she did not stop newspaper or mail deliveries while they were out of town, and she did not ask anyone to check on the house. She reported that no one had a spare key to her house. Mrs. Mundt stated that her family left town on Tuesday, November 22, 2011, and they returned on Saturday, November 26, 2011.

When the Mundt family returned home, they were unable to open the garage door. When they went to the back of the house, they noticed that the back door had been "smashed open." The power was off in the house, the electrical meter had been pulled off the outside wall of the house, and the phone lines were cut.

When Mrs. Mundt went inside, she noticed that some of the drawers in the master bedroom had been "tampered with," her jewelry box was open, and pieces of jewelry were lying on the floor. An iPad and a bronze-colored HP laptop were missing from Mr. Mundt's office. Gisela Mundt's jewelry box was found lying on her bed with pieces of jewelry strewn across the bed. Mrs. Mundt's daughter's jewelry box was open. Mrs. Mundt, her daughter, and Gisela Mundt were all missing pieces of jewelry, including some family heirlooms. Most of the jewelry taken from Mrs. Mundt was gold with gems. Gisela Mundt was missing several pieces of gold jewelry from her childhood in Germany. Mrs. Mundt's daughter was missing a couple of gold rings. The total cost to replace all the missing items was "well over $1,000." Mrs. Mundt stated that she did not know the Defendant and did not give him permission to enter her home or take her property. Eventually, the GPD contacted Mrs. Mundt to view a photograph of a laptop computer. When Mrs. Mundt viewed the photograph, it appeared to be the same color

and model as the laptop taken from the Mundt residence. However, the poor quality of the photo made it impossible to tell whether it was actually the Mundts' laptop. On cross-examination, Mrs. Mundt admitted that she did not see who broke into her house and that she had never seen the Defendant.

GPD Officer Michael Maggipinto testified that he responded to the call from the Mundt residence and spoke with the Mundt family. He also observed that the rear patio door had been pried open, the phone line had been cut, and the electrical meter was partially pulled off of the house. Inside the house, it appeared to Officer Maggipinto that someone had searched through the closets and drawers. Officer Maggipinto noted that an iPad, laptop computer, and several items of jewelry were missing. At the time, the Mundt family estimated that the approximate value of the missing items was $6,900.00. On cross-examination, Officer Maggipinto stated that he did not recall whether fingerprints were recovered from the scene.

Officer Iacobucci testified that he served as the crime scene unit officer at the Mundt residence. When he arrived at the scene, he noticed that the phone line had been cut, the electrical meter had been pulled from its casing, and the back door had been forced open. Inside the home, he saw that jewelry had been strewn across the bedrooms and closets. Officer Iacobucci took photos of the scene and dusted for prints, but he did not find any fingerprints.

Officer Iacobucci went outside to finish composing his report. While outside, he stood in the driveway and spoke with another officer. As they were talking, Officer Iacobucci observed a silver Mercedes approaching the Mundt residence travelling about twenty to twenty-five miles per hour. Officer Iacobucci recognized the vehicle as matching a vehicle description that officers had been told to be on the lookout for during roll call. The driver of the car and the vehicle's tag number also matched information that had been given to officers. Officer Iacobucci identified the Defendant as the driver. As the Defendant drove past the Mundt residence, Officer Iacobucci observed him look at the officers with a "surprised . . . deer in the headlight[s] look." Officer Iacobucci followed the vehicle and confirmed that it was registered to the Defendant. He then pulled the vehicle over.

Officer Iacobucci approached the Defendant's vehicle and asked him to step out of the car. As the Defendant exited the car, Officer Iacobucci saw folded up pieces of paper fall from the area of the Defendant's waistband. The Defendant tried to kick the paper underneath the car. Officer Iacobucci retrieved the paper and discovered that it was list of addresses in Germantown with notes as to whether there were newspapers piled in the driveway, boxes at the front door, or vehicles in the driveway. Officer Iacobucci understood the notes to indicate whether the occupants of the homes were out of town. Officer Iacobucci called other officers to check the addresses on the list to determine if

any of the homes had been broken into. Once Officer Iacobucci heard back from those other officers, he arrested the Defendant for burglary. Officer Iacobucci conducted a routine inventory search of the Mercedes before it was towed. Inside the vehicle, he found a bag of U.S. coins totaling $83.50, plus some foreign coins. Officer Iacobucci also collected the Defendant's cell phone.

On cross-examination, Officer Iacobucci agreed that it is not unusual for people to look at police officers as they drive by. However, Officer Iacobucci maintained that he did not notice the Defendant simply because he was looking in the officers' direction; he noticed the Defendant because of the expression on his face. Officer Iacobucci confirmed that the Mundt residence was not included on the list found with the Defendant. However, an address almost directly across the street from the Mundt residence was on the list.

GPD Officer Brad Bean testified that his lieutenant asked him to check on an address on Deerfield Lane ("the Williams residence"). When Officer Bean arrived, no one was home and two newspapers were sitting on the curb next to the mailbox. Officer Bean went to the back of the house and saw that the back door had been pried open. Several wires attached to the power meter were cut, and there was no power to the home. After entering the home, Officer Bean saw empty jewelry boxes on the bed in the master bedroom and several other items scattered throughout the room. Officer Bean contacted the homeowner, Lori Williams, via telephone to inform her of what he had found. Mrs. Williams reported that she was unable to return home immediately. Officer Bean then contacted a crime scene officer who came to the scene to dust for fingerprints and take photos. On cross-examination, Officer Bean stated that he canvassed the neighborhood to determine if anyone had seen anything unusual. However, he did not receive any information that he could use to develop a suspect. He also did not find any forensic evidence which would help him identify a suspect.

Lori Williams testified that she lived at the Williams residence with her husband and two young children. On the day before Thanksgiving in 2011, the Williams family traveled to Mrs. Williams' parents' home in Murfreesboro, Tennessee for the Thanksgiving holiday. When they left, all the doors and windows in the house were locked. Mrs. Williams had requested that the newspaper delivery be stopped while they were out of town, but she did not stop the mail service. She later discovered that newspapers were delivered to the residence despite her request that they be stopped. She did not recall asking anyone to check on the house while they were gone.

On the Saturday night following Thanksgiving, Mrs. Williams received a call from a GPD officer informing her that someone had broken into her home. After the call, Mrs. Williams immediately returned home. When she arrived, she saw that the security lock from the backdoor was on the floor and the door was damaged. In the master bedroom,

she found a jewelry box dumped onto the bed and drawers pulled open. She noticed that some jewelry items were missing. Mrs. Williams recalled that the insurance replacement value of the missing jewelry was between $2,000 and $3,000.

Additionally, Mrs. Williams reported that a plastic container that had been full of loose change was lying empty on the bed. Mrs. Williams explained that her husband would collect pocket change in the plastic container and, because Mr. Williams often traveled abroad, sometimes foreign coins would be mixed in with the coins in the container. Mrs. Williams estimated that there was $80 to $100 in the container. Once the container was full, she would take the coins to the bank, where they would be counted. A full container generally contained about $120 worth of coins. Any foreign coins in the container were removed from the rest of the coins and placed back into the container.

The power was on and the home phone line was working when Mrs. Williams returned to her residence. The security system connected to the home's landline was not working when she returned home. Mrs. Williams did not know the Defendant and did not give him permission to enter her residence or take any property from the residence.

Mrs. Williams also reported that the caller ID on her home phone showed some unusual calls made to the Williams residence while her family was out of town. Mrs. Williams did not recognize the number on the caller ID. Phone records indicated that the calls were received at 1:20 a.m., 1:21 a.m., and 1:22 a.m. on November 26, 2011. Each call lasted only a few seconds.

On cross-examination, Mrs. Williams stated that the cover to the box containing the phone line had been pulled off and that the security system was not working.

Clayton Williams, Mrs. Williams' husband, testified that he traveled frequently for his job. Prior to the date of the burglary, he had traveled to "fifty plus" countries, including Australia, Hong Kong, Japan, Belgium, France, the United Kingdom, Canada, Mexico, and some countries in the Middle East. He also stated that the Williams family had taken a cruise to the Bahamas "a number of years ago." Mr. Williams examined the foreign currency found in the Defendant's car and identified coins from the United Kingdom, Canada, the Bahamas, Australia, and Belgium. Mr. Williams stated that he did not know the Defendant and had not given him permission to enter the Williams residence or to take property from the home.

Melissa Miller testified that she was employed as the general manager of the Circle K in Germantown in November and December of 2011. During that time, the GPD asked her to copy surveillance video from November 26, 2011. The surveillance video showed a car enter the parking lot at 1:15 a.m. and park near the pay phone located outside the Circle K store. The car was still in the parking lot at 1:24 a.m. On cross-

- 13 -

examination, Ms. Miller explained that the video system was old and "skip[ped] quite a bit." She admitted that the video appeared to skip from 1:15 a.m. to 1:24 a.m. She said it was possible that, during that nine-minute skip, the car could have pulled out and come back. On redirect examination, Ms. Miller said the car appeared to be silver.

GPD Detective Kim Clark was assigned to investigate the break-in at the Dhaliwal residence in June 2011. As part of the investigation, she received information about charges made on Mr. Dhaliwal's credit card that were not made by members of the Dhaliwal family. Many of those charges were made at convenience stores or gas stations. Detective Clark attempted to obtain video surveillance from those locations but was unsuccessful. There was also a charge made to an online company, Health Solutions Network, for a box of Viagra that was shipped to an address on Boxdale Street in Memphis. Detective Clark went to that address and spoke with the resident, Mr. Rumley, who told her that a man had arrived at his home to sign for a package. Mr. Rumley was able to identify the man in a photo lineup. The man Mr. Rumley identified was the Defendant.

Detective Clark also investigated the burglaries at the Williams, Barker, and Mundt residences. The Williams family reported that they had received phone calls from a number they did not recognize. Detective Clark ran a search for the phone number and discovered that it belonged to a pay phone at the Circle K in Germantown. She requested surveillance footage from that location. The footage showed a Mercedes pull up to the pay phone at approximately the same time the calls were made to the Williams residence.

Detective Clark also conducted a search of the Defendant's cell phone after he was arrested in November. She found a photograph of a bronze laptop on the phone, which she showed to Mrs. Mundt. Mrs. Mundt was not able to positively identify the laptop, but she said it was similar to the laptop that was missing from her home.

Detective Clark reviewed the list of addresses recovered when the Defendant was arrested. The Williams residence and the Barker residence were included on that list. Both addresses had stars and notes about newspapers in the driveway next to them. Additionally, the list contained addresses close to the Dhaliwal residence and the Mundt residence. Detective Clark stated that, in all four burglaries, the back door was used to gain entry to the house and the victims were out of town. Additionally, the power was shut off and the phone lines were cut in a majority of the cases.

On cross-examination, Detective Clark said the Defendant had already been identified as a suspect before she spoke with Mr. Rumley. However, she said she placed the Defendant in the photo lineup based on Mr. Rumley's description of the man who collected the package from Mr. Rumley's home. Additionally, she recalled that Mr. Rumley told her that the man was driving a red scooter when he picked up the package.

Detective Clark stated that the signature in the FedEx records was from "Tobir Dhaliwal." She said she never interviewed anyone with that name. She confirmed that none of the missing items were subsequently found in pawn shops. She also explained that she identified the car in the Circle K video as a Mercedes by comparing it to photos of the Defendant's car. On redirect examination, Detective Clark stated that she could not tell whether the FedEx signature said "Tobir" or "Jasbir." She also explained that, based on her experience, the early morning phone calls to the Williams residence were made to verify that no one was home.

The Defendant testified that he had lived in Memphis for forty-four years. On November 22, 2011, he was at his mother's and girlfriend's respective homes and then traveled to the Hotel Casino in Tunica, Mississippi. He stayed at the hotel for three days. On November 25, he returned to Memphis. He recalled that he was at his mother's and girlfriend's homes and that he "basically just stayed in concentrating on some sports and stuff." He denied being at the Circle K gas station in Germantown between 1:00 a.m. and 2:00 a.m. on November 26, 2011.

On November 26, 2011, the Defendant visited his friend Cheryl[4] at her apartment in order to purchase drugs. The Defendant admitted that he had purchased cocaine from Cheryl "like every other day" for five or six months prior to his arrest.

While the Defendant was at Cheryl's apartment, she introduced him to two other men, who offered to pay the Defendant to investigate a list of addresses. The men asked the Defendant to determine whether the addresses were still consistent with how the list described them—specifically, whether there were newspapers by the mailbox, trash cans at the road, or flyers at the address. The men did not explain why they wanted the Defendant to investigate the addresses, and the Defendant did not ask. The men offered to pay the Defendant for his help with a bag of coins—which they claimed contained about $100—and "$15 worth of gas." The Defendant reported that the bag of coins he was given was the same bag of coins Officer Iacobucci found in his car. The Defendant also reported that part of the list of addresses was in Defendant's handwriting because he had "written the list with [the two men] because they kept the original list." The addresses the Defendant was supposed to investigate were labeled with a circled star or the phrase "check out." The Defendant took the men to "friend girl's" apartment and dropped them off. He was supposed to return to "friend girl's" apartment after he had checked on the addresses.

However, the Defendant stated that he had no intention of checking on any of the addresses because he was not familiar with the area where they were located. Instead, he

---

[4] The record does not contain Cheryl's last name. Therefore, we must refer to her by her first name in this opinion. We intend no disrespect.

had planned to return the list to the men and indicate that the addresses were the same as the list described them.  He drove to the Germantown Parkway and waited in the Wal-Mart and Target parking lots for about thirty minutes and then drove through Germantown in order to appear as if he had investigated the addresses.  Additionally, the Defendant was looking for a Kroger where he could use a coin machine to convert the bag of coins into bills.  While the Defendant was cutting through a Germantown neighborhood, he took a wrong turn, and he was pulled over by a police officer and arrested.  The Defendant reported that he drove a Mercedes.

On November 30, 2011, the Defendant voluntarily came to the Germantown jail to speak with Detective Clark about retrieving the Defendant's cell phone, car, and the bag of coins.  At that time, the Defendant signed a consent form to allow the police to search his phone.  The Defendant admitted that he had a photo of a laptop on his phone.  He explained that, while he was at the Casino Hotel, his niece called him and told him that her friend wanted to sell her laptop.  The Defendant stated that he was interested in purchasing the laptop for his girlfriend.  On November 24, 2011, the Defendant returned to Memphis in order to get some more information about the laptop and to take a photo of it to show his girlfriend.  He returned to the casino in order to show his girlfriend the photo.

The Defendant also stated that, on June 10, 2011, Cheryl paid him to go to an address on Boxdale Street in order to pick up a package that she had purchased with a credit card.  She told the Defendant that her recently deceased brother had lived at that address and that she had placed an order in his name to be delivered there.  Cheryl claimed she could not pick up the package herself because the package was in a man's name.  She gave the Defendant her brother's military ID which showed her brother's photo and name and the Boxdale address where the package was to be delivered.  The Defendant recalled that the name on the ID was Tobie.  He stated that he thought the last name was "a Muslim name."  The Defendant did not see the credit card Cheryl used to order the package.  He denied ordering the package himself.  The Defendant denied committing any of the burglaries or knowing where the burglarized homes were located.

On cross-examination, the Defendant admitted that he drove a silver Mercedes.  He stated that he started using cocaine in May of 2011 and continued to use cocaine until he was arrested.  Additionally, the Defendant admitted that he had never traveled outside the United States.  However, the Defendant also explained, "Somebody might have kidnapped me and took me [and] I didn't know."

The Defendant admitted that he lied when he told Detective Clark that the bag of coins found in his car were coins that he had collected from saving his spare change over several months and that he lied when he told the detective that he did not know how much was in the bag.

During cross-examination, the Defendant explained that the men had given him the $100 in coins before he left Cheryl's apartment. He stated that he took a short-cut on Spring Hollow Lane to find a Kroger; he was not investigating any of the addresses on the list. On redirect examination, the Defendant stated that he did not intend to investigate the addresses because he was not familiar with the neighborhood and had no way of finding them.

The jury convicted the Defendant as charged. Following a sentencing hearing, the trial court ordered partial consecutive sentences for an effective sixty-year sentence. This timely appeal followed.

## Analysis

The Defendant raises the following issues on appeal: (1) whether the trial court erred in denying the Defendant's motion to suppress the evidence seized at the time of his arrest; (2) whether the trial court erred in denying the Defendant's motion to sever the counts in the indictment; (3) whether the trial court erred in denying the Defendant's motion to exclude evidence of his prior record; and (4) whether the evidence was sufficient to support his conviction for each count in the indictment.

### Motion to Suppress

The Defendant argues that Officer Iacobucci did not have reasonable suspicion to stop the Defendant's car nor probable cause for the Defendant's arrest and, therefore, all evidence collected from the Defendant's car should have been suppressed. The State argues that the evidence collected from the Defendant's car was recovered during a legal stop because Officer Iacobucci had reasonable suspicion to stop the Defendant. We agree with the State.

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. Id. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. Id. We review the trial court's conclusions of law de novo. State v. Carter, 160 S.W.3d 526, 531 (Tenn. 2005).

The United States and Tennessee protect citizens from unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. Art. I, § 7; State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000). A vehicle stop and detention of the vehicle's occupants constitutes a seizure under both constitutions. Whren v. United States, 517 U.S. 806,

809-10 (1996); Binette, 33 S.W.3d at 218. In the context of a traffic stop, a person is seized when the officer activates the cruiser's blue lights. Binette, 33 S.W.3d at 218.

Generally, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 525, 629 (Tenn. 1997). A warrant is not required for an investigatory stop "when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997); see also Terry v. United States, 392 U.S. 1, 21 (1968); Binette, 33 S.W.3d at 218; Yeargan, 958 S.W.2d at 630; State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). Reasonable suspicion is "a particularized and objective basis for suspecting the subject of a stop of criminal activity [], and it is determined by considering the totality of the circumstances surrounding the stop[.]" Binette, 33 S.W.3d at 218 (citing Ornelas v. United States, 517 U.S. 690, 696 (1996); Alabama v. White, 496 U.S. 325, 330 (1990)). Probable cause is not required for an investigatory stop. State v. Coleman, 791 S.W.2d 504, 505 (Tenn. Crim. App. 1989) (citing Terry, 392 U.S. at 27; Hughes v. State, 588 S.W.2d 296, 305 (Tenn. 1979); State v. Foote, 631 S.W.2d 470, 472 (Tenn. Crim. App. 1982)).

In this case, the Defendant was clearly seized when Officer Iacobucci turned on the patrol car's blue lights, signaling the Defendant to stop his vehicle. At the time he initiated the traffic stop, Officer Iacobucci knew that the Defendant, a known burglar, was identified as a possible suspect for a series of burglaries in Germantown. Officer Iacobucci had been given a description of the Defendant's unique MO—the home's occupants were out of town, the electricity meter had been pulled from the house, the phone lines were cut, the back door was forced open, and electronics and jewelry were taken. Additionally, the officer had a description of the Defendant's car and tag number.

Officer Iacobucci had responded to a burglary call at the Mundt residence where the suspect's MO matched that of the Defendant. While still at the scene of the burglary, Officer Iacobucci observed the Defendant drive by the home, travelling under the speed limit, with a surprised, "deer in the headlights" expression. Officer Iacobucci also noted that the car and license tag number matched the description of the suspect vehicle officers had been told to be on the lookout for during roll call. Officer Iacobucci called in the tag number and received confirmation that the vehicle was registered to the Defendant and that none of the Defendant's listed addresses were in Germantown. In light of this evidence, Officer Iacobucci clearly had reasonable suspicion, supported by articulable facts, to conduct an investigatory stop of the Defendant's car.

After Officer Iacobucci lawfully stopped the Defendant, he asked the Defendant to step out of the car. Contrary to the Defendant's assertion that he was placed under arrest when Officer Iacobucci asked him to step out of the car, the record clearly shows Officer Iacobucci made the request for reasons of officer safety and that the Defendant was not under arrest at that time. For safety reasons, an officer making a valid traffic stop may, as a matter of course, require drivers to exit their vehicles. Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977); State v. Donaldson, 380 S.W.3d 86, 96 (Tenn. 2012). In such situations, "[t]he balance of competing interests favors the safety of the officer over the minimal intrusion to an individual directed to step outside of his vehicle after a valid traffic stop." Donaldson, 380 S.W.3d at 96. Officer Iacobucci was entitled to ask the Defendant to exit his vehicle.

Once the Defendant exited his vehicle, Officer Iacobucci observed two pieces of paper fall from the Defendant's waistband onto the ground and the Defendant try to kick those pieces of paper under the car. If a person abandons property, then they no longer have a reasonable expectation of privacy with respect to that property. State v. Baker, 966 S.W.2d 429, 433 (Tenn. Crim. App. 1997), abrogated by State v. Randolph, 74 S.W.3d 330 (Tenn. 2002), as recognized by State v. Keith Richard Gibson, No. W2010-02367-CCA-R3-CD, 2012 WL 1605220, at *8 (Tenn. Crim. App. May 8, 2012), perm. app. denied (Tenn. Aug. 15, 2012) (noting that abandoned property may still be excluded as fruit of an illegal seizure if the property was abandoned after an illegal seizure). We agree with the trial court that the Defendant abandoned the papers when he tried to kick them under the car. At that point, he no longer had a reasonable expectation of privacy in the papers, and because the Defendant had been legally seized at the time he abandoned his property, see Keith Richard Gibson, 2012 WL 1605220, at *8, Officer Iacobucci could seize this evidence. Thus, the trial court properly denied the Defendant's motion to suppress in regards to the pieces of paper.

Upon investigating the papers, Officer Iacobucci found them to contain a list of addresses and notes as to whether each address had cars in the driveway, newspapers piled by the door or mailbox, and packages at the door. Officer Iacobucci called in the addresses to dispatch, and dispatch informed him that two of the addresses on the list had been burglarized. At that point, Officer Iacobucci had probable cause to arrest the Defendant for the burglary of the Mundt residence based on the fact that the MO used in that burglary matched the Defendant's, Officer Iacobucci observed the Defendant drive by the Mundt residence travelling under the speed limit with a "deer-in-the-headlights" expression, the car and tag number matched the description of the suspect vehicle officers had been told to be on the lookout for during roll call, the Defendant was found with a list of addresses in the area containing notes as to whether the occupants were out of town, and other homes on that list had been burglarized. See Bridges, 963 S.W.2d at 491 (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)) ("Probable cause for an arrest without a

warrant exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'").

After the Defendant was lawfully arrested, Officer Iacobucci had a duty to tow the Defendant's car, which was illegally parked.[5]  Prior to the car being towed, Officer Iacobucci had a right to inventory the car.  See South Dakota v. Opperman, 428 U.S. 364, 372 (1976); cf. Drinkard v. State, 584 S.W.2d 650, 654 (Tenn. 1979) (holding that the inventory search exception does not apply when arrangements can be made for the car to be moved without the State impounding it).  During the inventory search, Officer Iacobucci found the pawn shop business cards, Cricket cell phone, and bag of coins totaling $83.40, plus a number of foreign coins.  Because these items were seized during a lawful inventory search, the trial court properly found that they were admissible.

*Motion to Sever*

Next, the Defendant argues that the trial court erred when it denied his motion to sever the offenses in the indictment.  The State contends that the offenses were part of a common scheme or plan and that the evidence of each offense would be admissible at the trial of the other offenses.  We agree with the State.

We review issues of permissive joinder and severance of offenses under Rules of Criminal Procedure 8(b) and 14(b)(1) for an abuse of discretion.  State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999).  Accordingly, a trial court's decision not to sever offenses will only be reversed "when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'"  Id. (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Rule 8(b) of the Tennessee Rules of Criminal Procedure provides that "[t]wo or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13, if: (1) the offenses constitute parts of a common scheme or plan; or (2) they are of the same or similar character."  Tenn. R. Crim. P. 8(b).  Conversely, Rule 14 provides that "[i]f two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others."  Tenn. R. Crim. P. 14(b)(1).

---

[5] Nothing in the record indicates that the Defendant was able to make arrangements for someone else to move his car.

- 20 -

Our supreme court has stated that the "primary inquiry into whether a severance should have been granted under Rule 14 is whether the evidence of one crime would be admissible in the trial of the other if the two counts of indictment had been severed." State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984). To protect a defendant's right to a fair trial, Tennessee Rule of Evidence 404(b) excludes "[e]vidence of other crimes, wrongs, or acts" committed by a defendant when the evidence is offered only to show the defendant's propensity to commit those "crimes, wrongs, or acts." Tenn. R. Evid. 404(b). However, evidence of other "crimes, wrongs, or acts" may be admissible for other purposes, such as motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, or a common scheme or plan for the commission of two or more crimes so related to each other that proof of one tends to establish the other. Id., Adv. Comm'n Cmts.; State v. Hoyt, 928 S.W.2d 935, 944 (Tenn. Crim. App. 1995), overruled on other grounds, Spicer v. State, 12 S.W.3d 438, 447 n.12 (Tenn. 2000).

Tennessee courts recognize three types of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. Shirley, 6 S.W.3d at 248. In this case, the trial court held that the first, "signature crimes," category did not apply. Instead, the trial court refused severance based on the fact that the offenses were part of a larger, continuing plan. We will address both categories.

Evidence of a distinctive design crime is most often introduced to establish the identity of perpetrator. Shirley, 6 S.W.3d at 248. "However, before multiple offenses may be said to evince a distinctive design, the 'modus of operandi employed must be so unique and distinctive as to be like a signature.'" Id. (quoting State v. Carter, 714 S.W.2d 241, 245 (Tenn. 1986)). The offenses need not be identical in every respect, but the methods used to commit the offenses "must have 'such unusual particularities that reasonable men can conclude that it would not likely be employed by different persons.'" Id. (quoting Harris v. State, 227 S.W.2d 8, 11 (Tenn. 1950)).

In this case, the crime scenes did exhibit several similar characteristics, such as the homes' owners were out of town, the power was disabled, the phone lines were cut, the perpetrator gained access through the back door, and jewelry and electronics were stolen. Although Officer Iacobucci stated he rarely saw all five of those factors during a burglary investigation, we do not believe such evidence was so unusual that a reasonable person could conclude that it was not likely that anyone other than the Defendant committed the crime. See id. Therefore, the trial court correctly found that the offenses were not signature crimes.

Next we turn to whether these offenses were part of a larger, continuing plan or conspiracy. A larger, continuing plan or conspiracy "involves not the similarity between

the crimes, but [rather] the common goal or purpose at which they are directed." State v. Denton, 149 S.W.3d 1, 15 (Tenn. 2004) (quoting Hoyt, 928 S.W.2d at 943). In other words, crimes that are part of a larger plan or conspiracy must be committed "in furtherance of a plan that had a readily distinguishable goal, not simply a string of offenses." Id.

In this case, the Defendant had a list of over twenty addresses in Germantown along with notes indicating whether cars were located in the driveway, newspapers were piling up at the mailbox, or mail was left on the front porch. Additionally, both the Barker and Williams residences were on the list, and the other two homes the Defendant was accused of burglarizing were located very close to addresses included on the list. The list tends to show that the Defendant was casing this Germantown neighborhood to determine when the homes' occupants were out of town in order to break into the houses and steal property. We believe this evidence shows that the Defendant's acts for which he was charged were part of a larger working plan to burgle additional unoccupied homes in Germantown and that they were not simply a string of burglaries. Additionally, we conclude that evidence of each crime would be admissible in a trial of the others as evidence of a common scheme or plan under Rule 404(b) to show identity. Accordingly, the trial court did not abuse its discretion when it denied severance of the offenses.

*Impeachment by Prior Convictions*

The Defendant argues that the trial court erred in allowing the State to use the Defendant's prior convictions for theft, identity theft, and fraudulent use of a credit card as impeachment evidence. The Defendant contends that, because he was on trial for the same offenses in the instant case, the probative value of the prior convictions was outweighed by their prejudicial effect. The State argues that the trial court properly exercised its discretion and that the probative value of the evidence outweighed any prejudicial effect. We agree with the State.

A defendant's prior convictions may be used to impeach that defendant if the convictions meet the criteria established by Tennessee Rule of Evidence 609. According to this rule, prior adult convictions may be used to impeach a defendant if:

(a) the conviction is for a crime punishable by death or imprisonment in excess of one year, or the conviction is for a misdemeanor which involved dishonesty or false statement; (b) less than ten years have elapsed between the date the accused was released from confinement and the commencement of the subject prosecution; (c) the State gives reasonable pretrial written notice of the particular conviction or convictions it intends to use as impeachment; and (d) the trial court concludes that the probative

> value of the prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues.

State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999); see also Tenn. R. Evid. 609. We review a trial court's ruling of the admissibility of prior convictions for the purpose of impeachment under an abuse of discretion standard. State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003).

In this appeal, the Defendant only challenges the trial court's finding as to the last condition—whether the probative value of his prior convictions outweighs their prejudicial impact. To determine whether the probative value of prior convictions outweighs the prejudicial impact, trial courts should "(a) assess the similarity between the crime on trial and the crime underlying the impeaching conviction, and (b) analyze the relevance of the impeaching conviction had to the issue of credibility." State v. Baker, 956 S.W.2d 8, 14 (Tenn. Crim. App. 1997) (quoting N. Cohen, D. Paine, and S. Sheppard, Tennessee Law of Evidence, § 609.9 at p. 376 (3rd ed. 1995)) (internal quotation marks omitted). Prior convictions are relevant to the issue of credibility when the elements of the prior crime involve dishonesty or false statement. See State v. Walker, 29 S.W.3d 885, 891 (Tenn. Crim. App. 1999); see also Waller, 118 S.W.3d at 372.

When an impeaching conviction is substantially similar to the crime for which the defendant is being tried, there is a danger that the jury will erroneously use the impeaching conviction as propensity evidence to conclude that the defendant acted in conformity with the behavior that resulted in the prior convictions. Mixon, 983 S.W.2d at 674. However, "[t]he mere fact that a prior conviction of the accused is identical or similar in nature to the offense for which the accused is being tried does not, as a matter of law, bar the use of the conviction to impeach the accused as a witness." Baker, 956 S.W.2d at 15.

In this case, the trial court specifically found that the Defendant's prior convictions for identify theft, theft of property, and fraudulent use of a credit card were probative to the issue of the Defendant's credibility and their probative value outweighed their prejudicial effect. This court has previously stated that theft convictions are "highly probative of credibility" because the crime involves dishonesty. Id. (internal citations and quotation marks omitted). Additionally, the elements of the other challenged convictions, identify theft and fraudulent use of a credit card, both include elements of fraud or dishonesty. See Tenn. Code Ann. § 39-14-118(b) (2010) (person commits fraudulent use of a credit card when the person knows the card is forged, stolen, revoked, cancelled, expired, or that the person is not authorized to use the card); Tenn. Code Ann. § 39-14-150 (2010) (person commits identify theft when the person knowingly obtains, possesses, buys, or uses another's personal identifying information to obtain credit,

goods, services, or medical information without the other person's consent or authority to use the other person's identifying information). All three challenged prior convictions—theft, identify theft, and fraudulent use of a credit card—involved dishonesty and therefore were probative as to the issue of the Defendant's credibility.

Moreover, we do not believe the probative value of the Defendant's prior convictions was outweighed by the prejudice created by similarity between the Defendant's prior convictions and the offenses for which he was being tried. The State simply asked the Defendant whether he had prior convictions for those crimes. None of the facts underlying the prior convictions were introduced at trial. Additionally, the trial court specifically excluded the Defendant's prior convictions for burglary because those prior convictions were too similar to the evidence that was presented at trial. Moreover, the trial court gave the jury a limiting instruction, stating that any proof of prior convictions could only be used to judge the Defendant's credibility and not as substantive evidence. Therefore, we conclude that the trial court did not abuse its discretion when it allowed the State to impeach the Defendant with his prior convictions for theft, identify theft, and fraudulent use of a credit card.

*Sufficiency of the Evidence*

Finally, the Defendant challenges the sufficiency of the evidence supporting each of his convictions. Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight and value to be given the evidence are resolved by the fact finder. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded on other grounds by Tenn. R. Crim. P. 33 as stated in State v. Moats, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

The identity of the perpetrator is an essential element of any crime and may be proven by circumstantial evidence alone. State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002) and State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The weight to be given to circumstantial evidence, the inferences to be drawn from such evidence, and "the extent to which the circumstances are consistent with guilt and inconsistent with innocence" are questions for the jury. Id. (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)).

### a. Aggravated Burglary (Counts 1, 5, 7, and 9)

As charged in the indictment, "[a] person commits burglary who, without the effective consent of the property owner . . . [e]nters a building . . . not open to the public, with intent to commit a felony, theft or assault[.]" Tenn. Code Ann. § 39-14-402(a)(1) (2010). Aggravated burglary is defined as "burglary of a habitation." Tenn. Code Ann. § 39-14-403 (2010). As relevant to this case, habitation is defined as "any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons[.]" Tenn. Code Ann. § 39-14-401(1)(A) (2010).

The Defendant does not dispute the fact that all four homes were broken into and that items were taken therefrom. He simply argues that there is insufficient evidence to identify him as the perpetrator. We disagree. When the Defendant was stopped, he had a list of addresses along with notes indicating whether the occupants of those homes were out of town. The Williams residence and the Barker residence were included on the list. Additionally, the list included an address almost directly across the street from the Mundt residence and another address near the Dhaliwal residence. The residents of all four homes were out of town at the time the burglaries occurred. Moreover, the MO used in each individual burglary was similar to one another. Also, security video from a Circle K gas station in Germantown showed a car matching the Defendant's car near a payphone around the time that phone calls were made from that payphone to the Williams residence.

Additionally, a bag containing foreign currency and $83.40 in coins, along with some foreign coins, was found in the Defendant's car. Mrs. Williams estimated that $80 to $100 in coins was stolen from a container where she and her husband kept their spare change. She also explained that they had coins from several foreign countries in that same container. The foreign currency found in the Defendant's car came from several of the countries where members of the Williams family had traveled. The Defendant admitted that he had never traveled outside the United States, and apart from his hypothesis that he was kidnapped and taken abroad without his knowledge, he could not explain how foreign currency came to be in his car. Finally, a photo of a laptop consistent with the laptop that was stolen from the Mundt residence was found on the

Defendant's phone. In light of all this evidence, a rational juror could have concluded that the Defendant was the person who entered the Dhaliwal, Barker, Mundt, and Williams residences without the effective consent of the owners with the intent to commit a theft. Accordingly, there is sufficient evidence to support the Defendant's convictions for aggravated burglary.

### b. Theft of Property (Counts 2, 6, 8, and 10)

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (Supp. 2011). Similar to his argument for the burglary convictions, the Defendant argues that the evidence was insufficient to identify him as the person who stole the victims' property because there were no jewelry, credit cards, or electronic items found in his possession. As to the coins and foreign currency found in his car, the Defendant contends that Mrs. Williams did not identify the coins as hers or her husbands and "many people have foreign coins."

As noted above, the evidence was sufficient to establish the Defendant's identity as the person who broke into each of the four residences. It was reasonable for the jury to conclude that the stolen property was taken during the course of the burglaries. The property did not need to be found in the Defendant's possession for the jury to conclude that the Defendant was the person who stole the items. Furthermore, a photo of a laptop consistent with the one stolen from the Mundt residence was found on the Defendant's phone. Additionally, a package that was purchased with the stolen credit card was picked up by a person who Mr. Rumley identified as the Defendant. As to the coins, Mrs. Williams estimated that there was $80 to $100 in the container at the time the coins were stolen. The bag of coins in the Defendant's car totaled $83.40. Further, even though the Defendant asserts that "many people have foreign coins," he does not explain why he would have currency from several different countries when, to his knowledge, he has never traveled outside the United States. Based on the evidence in the record, a rational juror could conclude that the Defendant was the person who stole the victims' property. Therefore, the evidence was sufficient to support the Defendant's convictions for theft of property.

### c. Fraudulent Use of a Credit Card (Count 4)

As charged in the indictment, "[a] person commits the crime of fraudulent use of a credit or debit card who uses, or allows to be used, a credit card or debit card or information from that card, for the purpose of obtaining property, credit, services or anything else of value with knowledge that . . . the use of the card is unauthorized by either the issuer or the person to whom the credit or debit card is issued." Tenn. Code Ann. § 39-14-118(b)(4) (2010).

The Defendant argues that there is no proof in the record to establish that he made the unauthorized internet and convenience store purchases. Additionally, the Defendant argues that, because the card bore the name of Mr. Dhaliwal's son, the evidence was insufficient to show that the Defendant fraudulently used Mr. Dhaliwal's credit card.

As to the Defendant's first argument, the evidence was sufficient to show that he was the person who made the unauthorized purchases. As previously stated, the evidence was sufficient to establish that the Defendant was the person who burgled the Dhaliwal residence and stole the credit card. The credit card was used to purchase a shipment of Viagra online, and the Defendant retrieved the package from Mr. Rumley's residence. Additionally, Mr. Dhaliwal identified charges that were made at convenience stores in Memphis while the Dhailwal family was out of the country. A rational juror could conclude that the Defendant used the credit card without Mr. Dhaliwal's authorization.

Second, the Defendant argues that the evidence was insufficient to support his conviction on this count because the card was issued to Mr. Dhaliwal's son. Consequently, the Defendant contends that the proof did not establish that he "unlawfully or knowingly used a [credit card] issued to [Mr.] Dhaliwal." We note that the meaning of a "person to whom the credit or debit card is issued" is not clear from the plain language of the statute. Additionally, we are unable to find any Tennessee case law interpreting this language. However, there is no clear proof in the record showing that the credit card was issued to Mr. Dhaliwal's son, and Mr. Dhaliwal explained that he made all the payments on the credit card account. Nevertheless, we conclude that the evidence is sufficient to establish that the Defendant used the credit card without the authorization of either Mr. Dhaliwal or his son. The last time the credit card was seen, Mr. Dhaliwal told his son that he would not need the card while they were overseas, and the son placed the credit card on a shelf in his room. The card was then stolen during the course of the burglary of the Dhaliwal residence. Additionally, none of the charges made at the Memphis convenience stores were made by members of the Dhaliwal family. As established above, the evidence was sufficient to show that the Defendant was the person who burglarized the Dhaliwal residence and stole the credit card. Based on the evidence in the record, it was rational for the jury to conclude that the Defendant used the credit card and did so knowing he did not have the authorization of either Mr. Dhaliwal or his son. Therefore, the evidence was sufficient to support the Defendant's conviction for fraudulent use of a credit card.

### d. Identity Theft (Count 3)

As charge in the indictment, "[a] person commits the offense of identity theft who knowingly obtains, possesses, buys, or uses, the personal identifying information of another . . . [w]ith the intent to commit any unlawful act including, but not limited to, obtaining or attempting to obtain credit, goods, services, or medical information in the

name of such other person[] and . . . [w]ithout the consent of such other person."  Tenn. Code Ann. § 39-14-150(b)(1) (Supp. 2011).  As relevant to this case, personal identifying information is defined as:

> [A]ny name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including:
>
> (1) Name, social security number, date of birth, official state or government issued driver license or identification number, alien registration number, passport number, employer or taxpayer identification number; [or] . . .
>
> (3) Unique electronic identification number, address, routing code or other personal identifying data which enables an individual to obtain merchandise or service or otherwise financially encumber the legitimate possessor of the identifying data[.]

Tenn. Code Ann. § 39-14-150(e)(1), (3) (Supp. 2011).

The Defendant argues that the evidence was insufficient to show that he used the personal identifying information of Mr. Dhaliwal because none of Mr. Dhaliwal's personal identifying information was taken from the Dhaliwal residence and because Mr. Rumley "was unable to testify that the identification shown to the FedEx delivery man was a credit card."

As established above, the evidence was sufficient to show that the Defendant stole the credit card from the Dhaliwal residence.  That same credit card was used to purchase an order of Viagra that was delivered to Mr. Rumley's home.  When the package was delivered, the Defendant, who Mr. Rumley identified in a photo lineup, arrived at Mr. Rumley's home to accept delivery of the package.  Mr. Rumley observed the Defendant show the FedEx delivery person some form of identification, but he could not see what type of identification it was.  Additionally, he saw that the name on the package started with a "D," and he testified that the FedEx carrier noted that the name on the package matched the name of the form of identification.  An examination of the FedEx records introduced into evidence shows that the package was addressed to "Torbir Dhaliwal." One of Mr. Dhaliwal's sons is named Tobir, but it is not clear from the record whether the stolen credit card belonged to Tobir Dhaliwal.  Nevertheless, Mr. Dhaliwal testified that his son's credit card was attached to Mr. Dhaliwal's account and Mr. Dhaliwal made all the payments on the account.  Accordingly, a rational juror could conclude that the Defendant used personal identifying information in the form of a unique electronic identification number which enabled the Defendant to financially encumber Mr. Dhaliwal.  Therefore, the evidence was sufficient to support the Defendant's conviction for identify theft.

## Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE